**FILED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AUG - 4 2008

Clerk, U.S. District and
Bankruptcy Courts

CIVIL ACTION No.

KAZENERCOM TOO;
ASSOCIATION OF KAZAKH
INVESTORS AND
ENTREPRENEURERS;
PUBLIC FOUNDATION OUR HOUSE
KAZAKHSTAN;
KINOZHUZ;
YERKIN BEKTAYEV;
BERIK BEKTAY;
KANET MEIRMANOV

    Plaintiffs

v.

TURAN PETROLEUM, INC.;
TREK RESOURCES, INC.;
IBAR DEVELOPMENT LLC;
IBAR VENTURES LLC;
ASKAR ("AKAR") KARABAYEV;
ANATOLY ("TONY") VANETIK;
NAUM VOLOSHIN;
TIMUR KOICHUMANOV;
ALEXANDER KUSHNERENKO;
ALEX STRIGANOV;
and DOES from 1 to 100

    Defendants

**VERIFIED COMPLAINT**

**FOR DAMAGES, IMPOSITION OF
CONSTRUCTIVE TRUST AND
ORDERS BASED ON:**

1. RACKETEER INFLUENCED
   AND CORRUPT
   ORGANIZATION ACT (RICO);
2. VIOLATION OF SECURITIES
   LAWS;
3. CONVERSION;
4. BREACH OF CONTRACT;
5. TORTIOUS INTERFERENCE
   WITH BENEFICIAL
   COMMERCIAL RELATIONSHIP;
6. FRAUD AND
   MISREPRESENTATION;
7. UNJUST ENRICHMENT;
8. CIVIL CONSPIRACY;
9. FRAUDULENT
   CONVEYANCES,
   ACCOUNTING;
10. DECLARATORY RELIEF;
11. DAMAGE TO BUSINESS
    REPUTATION;
12. DAMAGES FOR BODILY
    INJURY, ATTEMPTED MURDER

DEMAND FOR JURY TRIAL

Case: 1:08-cv-01339
Assigned To : Huvelle, Ellen S.
Assign. Date : 8/4/2008
Description: General Civil



## I. NATURE OF ACTION

1.    This is an action both in law and in equity that seeks monetary damages, punitive

damages and injunctive relief. Plaintiffs KAZENERCOM TOO, ASSOCIATION OF

1

KAZAKH INVESTORS AND ENTREPRENEURERS, PUBLIC FOUNDATION OUR HOUSE KAZAKHSTAN, KINOZHUZ, YERKIN BEKTAYEV, BERIK BEKTAY, and KANET MEIRMANOV in this Verified Complaint against Defendants TURAN PETROLEUM, INC., TREK RESOURCES, INC., IBAR DEVELOPMENT LLC, IBAR VENTURES LLC, ASKAR ("AKAR") KARABAYEV, ANATOLY ("TONY") VANETIK, NAUM VOLOSHIN, TIMUR KOICHUMANOV, ALEXANDER KUSHNERENKO, and ALEX STRIGANOV allege as follows:

## II. PARTIES

2.      Plaintiff KAZENERCOM TOO (hereinafter "KEC") is a corporation organized under the laws of Kazakhstan, with main offices at: Dostyk 33, #2, Almaty, Kazakhstan. KEC is in the business of oil exploration, with particular focus on exploring oil reserves in Southern Kazakhstan.

3.      Plaintiff    ASSOCIATION    OF    KAZAKH    INVESTORS    AND ENTREPRENEURS, also known as 'Kazakhstan-2030' is a not-for-profit entity established by 28 initial corporate members under the laws of Kazakhstan in 1998, with offices at: Tynybayev Str., 49-303, Shymkent, Kazakhstan. The Association has interest in the projects of KEC, in the Government's concession at issue, and supports KEC's position therein.

4.      Plaintiff PUBLIC FOUNDATION OUR HOUSE KAZAKHSTAN is a not-for-profit entity organized under the laws of Kazakhstan in 1998, with offices at: Dorozhnik 44-8, Almaty, Kazakhstan.   Our House has interest in the projects of KEC, in the Government's concession at issue, and supports KEC's position therein.

5.      Plaintiff KINOZHUZ is a corporation organized under the laws of Kazakhstan, with offices at: Tauke-Khana, 35 B, Shymkent, Kazakhstan.  Kinozhuz has interest in the

2

projects of KEC, including financial interest therein. Kinozhuz is a Kazakh national cinematic company that was to make a documentary movie about the oil exploration by KEC in Southern Kazakhstan, based on the Kazakh Government's concession.

6.      Plaintiff YERKIN K. BEKTAYEV (hereinafter "Bektayev") is a citizen of Kazakhstan, engaging in business in Kazakhstan and internationally, with the address: c/o Kazenercom TOO, Dostyk 33, #2, Almaty, Kazakhstan. At the relevant times, Bektayev was the Director of KEC, as well as the President of Turan Enerpetroleum TOO (see below).

7.      Plaintiff BERIK K. BEKTAY (hereinafter "Bektay") is a citizen of Kazakhstan, engaging in business in Kazakhstan and internationally, with the address: Mametova 33, Shymkent, Kazakhstan. At all relevant times, Bektay was the senior adviser of the director of KEC and he has had interest in KEC.

8.      Plaintiff KANET MEIRMANOV (hereinafter "Meirmanov") is a citizen of Kazakhstan, engaging in business in Kazakhstan and internationally, with the address: c/o Kazakhenergocom TOO, Dostyk 33, #2, Almaty, Kazakhstan. At all relevant times, Meirmanov was the employee of KEC and a stake holder therein, he also supervised seismic tests for KEC.

9.      Defendant TURAN PETROLEUM, INC. (hereinafter "Turan") is a corporation organized under the laws of the State of Nevada, that engages in business in the U.S. and internationally. Turan was originally incorporated as Elite Registry, Inc., a shell corporation in Nevada, then it was renamed, becoming Turan. The registered agent's office of Turan is at: 502 North Division Street, Carson City, NV 89703. Turan's main office is at: 940 South Coast Drive #100, Costa Mesa, CA 92626. This Court has jurisdiction over Turan, because it made public offerings published through the Securities

Exchange Commission in Washington, D.C. and because Turan has participated in a racketeering enterprise.

10.     Defendant TREK RESOURCES, INC. (hereinafter "Trek") is a corporation organized under the laws of the State of Nevada, that engages in business in the U.S. and internationally. The registered agent office of Trek is at: 502 North Division Street, Carson City, NV, 89703, and its actual main office is at: 940 South Coast Drive #100, Costa Mesa, CA, 92626 (the same as for Turan). This Court has jurisdiction over Trek, because it holds, on information and belief, a part of the stock in Turan, which made public offerings published through the Securities Exchange Commission in Washington, D.C. and because Trek has participated in a racketeering enterprise.

11.     Defendant IBAR DEVELOPMENT LLC (hereinafter "Ibar") is a company organized under the laws of the State of California, that engages in business in the U.S. and internationally. Ibar's address is at: 940 South Coast Drive #100, Costa Mesa, CA 92626 (jointly with Turan). Among other States, Ibar also engages in business in Texas, Nevada, and Arizona. This Court has jurisdiction over Ibar, because it participates, on information and belief, in holding Turan, which made public offerings published through the Securities Exchange Commission in Washington, D.C. and because Ibar has participated in a racketeering enterprise.

12.     Defendant IBAR VENTURES LLC (hereinafter "Ibar Ventures") is a company organized under the laws of the State of Delaware, that engages in business in the U.S. and internationally, with the registered agent's office at: National Corporate Research Ltd., 615 South Dupont Highway, Dover, DE, 19901. This Court has jurisdiction over Ibar Ventures, because it participates, on information and belief, in holding Turan, which

4

made public offerings published through the Securities Exchange Commission in Washington, D.C. and because it has participated in a racketeering enterprise.

13.    Defendant ASKAR (aka "AKAR") KARABAYEV (hereinafter "Karabayev") is an alien (citizen of Kazakhstan), believed to reside, at least temporarily, in Los Angeles area, California.  Karabayev was involved in Turan from April of 2007, becoming its President and CEO since June of 2008.  Karabayev's address is: c/o Ibar Development LLC, 940 South Coast Drive #100, Costa Mesa, CA, 92626.  This Court has jurisdiction over Karabayev because he has participated in a racketeering enterprise and because he is an alien.

14.    Defendant ANATOLY (aka "TONY") VANETIK (hereinafter "Vanetik") is, on information and belief, an alien (citizen of Russia or of Ukraine), believed to reside, at least temporarily, in Los Angeles area, California.  Vanetik's address is: c/o Turan Petroleum Inc., 940 South Coast Drive #100, Costa Mesa, CA 92626.  Vanetik was President of Turan at the relevant times.  This Court has jurisdiction over Vanetik because he has participated in a racketeering enterprise and because he is, on information and belief, an alien.

15.    Defendant NAUM VOLOSHIN (hereinafter "Voloshin") is an alien (citizen of Russia), believed to frequently visit, or reside in, Los Angeles area, California.  Voloshin was Turan's Chief Operating Officer at all relevant times.  Voloshin's address is: c/o Turan Petroleum, Inc., 940 South Coast Drive #100, Costa Mesa, CA 92626.  This Court has jurisdiction over Voloshin because he has participated in a racketeering enterprise and because he is an alien.

16.    Defendant TIMUR KOICHUMANOV (hereinafter "Koichumanov") is an alien (citizen of Kazakhstan), believed to frequently visit, or reside in, visit Los Angeles area,

California.  Koichumanov has been an officer or employee of Turan and/or Turan Enerpetroleum TOO since about May of 2007.  He has Turan's member of the Board of Directors since June of 2008.  Koichumanov's address is: c/o Turan Petroleum, Inc., 940 South Coast Drive #100, Costa Mesa, CA 92626.  This Court has jurisdiction over Koichumanov because he has participated in a racketeering enterprise and because he is an alien.

17.    Defendant    ALEXANDER    KUSHNERENKO,    aka    ALEXANDR KUSHNIRENKO (hereinafter "Kushnerenko") is an alien (citizen of Russia), believed to frequently visit, or reside in, Los Angeles area, California.  Kushnerenko was an officer or employee of Turan at all relevant times.  Kushnerenko's address is: c/o Turan Petroleum Inc., 940 South Coast Drive #100, Costa Mesa, CA 92626. This Court has jurisdiction over Kushnerenko because he has participated in a racketeering enterprise and because he is an alien.

18.    Defendant ALEX STRIGANOV (hereafter "Striganov") is an alien (citizen of Russia), believed to frequently visit, or reside in, at least temporarily, in Los Angeles area, California.  He was Turan's employee, in particular he prepared misleading information for Turan's website and engaged in other activities of the enterprise. Striganov's address is: c/o Turan Petroleum Inc., 940 South Coast Drive #100, Costa Mesa, CA 92626.  This Court has jurisdiction over Striganov because he has participated in a racketeering enterprise and because he is an alien.

### III. JURISDICTION

19.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §1962, §1964, and §1965 (RICO).

6

20.    This Court also has jurisdiction pursuant to 28 U.S.C. §1331, 1337 and §27 of the Securities Exchange Act 15 U.S.C. §78aa, as well as 15 U.S.C. §78i, 15 U.S.C. §77z-1. Namely, Defendants used a Notice of Sale of Securities, published with and/or through the Securities Exchange Commission in Washington, D.C.

21.    Defendants further transacted business marketing securities and made public offerings of securities in the District of Columbia, within the meaning of a proper venue pursuant to 15 U.S.C. §77v.

22.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce. The amount in controversy, exclusive of interest and costs, is in excess of $75,000.

23.    Venue is proper in this District pursuant to §27 of the Securities Exchange Act, and 28 U.S.C. §1391(b) and (d) ("an alien may be sued in any district"). Venue is also proper because Plaintiffs anticipate intervention, on the side of Plaintiffs, or involvement of the Government of Kazakhstan, including through its Embassy situated in the District of Columbia.

## IV. FACTS COMMON TO ALL COUNTS

### (a) Underlying Facts Concerning Oil Exploration in Kazakhstan

24.    Kazakhstan, a country situated in Central Asia, has considerable reserves of extractable oil and gas, some discovered and being developed, and some being in the stage of exploration. The Government of Kazakhstan has encouraged private investments for exploration and development of oil and gas reserves, using the mechanism of contractual concessions for certain selected plots, to explore and extract oil and gas yet to be confirmed, for up to 25 years' of a concession's duration.

25.    In 2001, the Kazakh Government entered a Concession Agreement (hereinafter "the Concession") with Aral Petroleum Co. (hereinafter "Aral Petroleum"), a company organized under the laws of Kazakhstan. The subject matter of the Concession was the exploration and development of the oil and gas resources on the territory 22,000 sq. km, or approximately 5 million acres, mainly in Shymkent region, with a minor part in Kzylorda region in Southern Kazakhstan.

26.    Various geological surveys and seismic tests in Kazakhstan have provided reasonably reliable indications that the estimated reserves of oil and gas in that Concession territory of 5 million acres may constitute up to 300 million tons (ca. 2,250 million barrels) of crude oil.

27.    Under that scenario, the value of the untapped oil reserves within the Concession territory may exceed $2 billion in current crude oil prices, with relatively low costs of drilling and extraction in Kazakhstan. The duration of the Government's Concession (the total duration of 25 years) allowed to extract that volume and to generate profits ultimately to exceed $1 billion.

28.    In about May of 2004, Aral Petroleum created a joint venture with KEC, agreeing to endow a newly established Turan Enerpetroleum TOO ("TEP"), a corporation organized under the laws of Kazakhstan. TEP was vested with the rights in the Concession. Aral Petroleum and KEC agreed on a 51/49 interest apportionment between them as to the rights in the Concession agreement.

(b) Acquisition of License to Undertake Oil Exploration and Development

29.    On December 1, 2004, Aral Petroleum agreed to sell its 51% of interest in TEP to Elite Registry, Inc. (a shell entity later to be renamed as Turan), which translated to its 51% interest in the Concession with the Government of Kazakhstan.

30. Elite Registry Inc. was a shell entity, incorporated (since March of 2001) under the laws of the State of Nevada, with the registered agent at: 502 North Division St., Carson City, NV, 89703. On about December 28, 2004, Elite Registry Inc., as cited above, was reregistered in the State of Nevada as Turan.

31. On January 7, 2005, Turan's Board of Directors empowered its Director General Yedil Kassymov ("Kassymov") to be a liaison officer with officials of the Government of Kazakhstan on the issues of the Concession.

32. On February 14, 2005, Turan posted a public Notice of Sale of Securities through the Securities Exchange Commission (SEC) in Washington, D.C., publishing its address at: 3720 South Susan St., #100, Santa Ana, CA, 92704. SEC granted Turan I.D. #0001317906. Turan's Notice of Sale of Securities [under Regulation D and Section 4(6) of the Securities Act of 1933], Item 06, provided, however, very little information.

33. On February 28, 2005, KEC and Turan entered an agreement on Turan's priority to acquire 51% in TEP, consequently in the Concession, setting the terms for Turan's participation. Namely, Turan and KEC concluded an Agreement under which Turan received 51% of TEP's stock. The Minutes of the stockholders' general meetings in KEC and Turan were both signed on about March 14, 2005. On March 18 2005 KEC paid through the bank to Aral for 51 % in TEP.

34. On March 14, 2005, Aral transferred, with permission of KEC, 51% of stock in TEP, in accordance with the Agreement of February 28. On April 20, 2005, that transfer of the 51% stock in TEP was registered at the Department of Justice of Kazakhstan.

35. On March 26, 2005, a second agreement was made by e-mail between the same parties. It stated supplemental terms for KEC's remuneration in the U.S. Upon Vanetik's insistence, Bektayev and Kassymov signed it for KEC.

(c ) Fraud of Providing Void Securities for Acquiring Rights Under Concession

36.    Vanetik proposed to Bektayev to compensate his interest in Turan by transferring 26,181,380 shares in Turan. That also included an option on 10,000,000 common shares in Turan that could be exercised later, however, on information and belief, Vanetik did not intend to make that option available to Bektayev and converted it.

37.    Out of that package, 24,381,862 shares in Turan were to be held through a Nevada company, Trek, in a restricted form. Additionally, 2,618,138 shares in Turan were issued directly to Bektayev's name. See Appendix A.

38.    All of Turan's 26,181,380 shares so issued, ostensibly for the benefit of Bektayev, were in fact restricted stock, without the holder's right to sell these shares on the real and legitimate market for 2 years, only after which that restriction was supposedly to expire.

39.    According to Vanetik's misrepresentations by e-mail, in particular to Bektayev on April 14, 2005, and Vanetik's misleading oral statements, a true value of the Turan stock could be ascertained from public sources such as Bloomberg and Zacks. That value was shown by those sources as though the market value of Turan's shares was $12.50 a share. See Appendix B.

40.    Given that listed stock quote price, the Turan stock package ostensibly transferred to Bektayev and KEC translated into the alleged value of about $304,773,275. In fact, that valuation was artificially inflated and created by Vanetik (as Turan's President and Chairman of the Board) and other Defendants who used isolated transactions between insiders for sophisticated manipulations resulting in that published information, as described in more detail below.

41.    It was also a part of the agreement that a portion of the consideration was to be paid by a money transfer. Turan was to pay $450,000 to KEC, asking for an invoice for

that amount, and receiving that invoice from KEC. After that money was promised, for various excuses, that amount was ultimately never paid.

42. On April 19, 2005, Trek was incorporated under the laws of the State of Nevada, with the registered agent's address at: 502 North Division St., Carson City, NV, 89703 (the same as Turan). Bektayev was named its initial director and president. Vanetik used his exclusive contact with the registered agent in Carson City, Nevada, to manipulate with the Trek registration documents.

43. On April 27, 2005 Kassymov (acting in the name of Turan and TEP) misrepresented to all parties concerned that he had a permission from the Government of Kazakhstan to transfer 49 % from KEC to Turan, even though this was untrue. Kassymov essentially became Turan's agent, overcoming his duties as TEP's Director General to secure the KEC minority's interests. Turan later paid to Kassymov $102,000, which was not disclosed to KEC.

44. On May 25, 2005, Turan and KEC signed an Agreement on the sale of 49% (together with the prior 51% adding up to a full 100% acquisition). That agreement was to be governed by Kazakh law. That agreement cited supplemental terms, as a precondition for the registration of Turan's 100% control of TEP in order to fulfil the Agreement from March 26, 2005.

45. On June 1, 2005, Turan's Board of Directors, Vanetik and Robert Van Duren, CEO, issued a letter of guarantee to KEC to pay $450,000.

46. On June 15-25, 2005, Bektayev and Kassymov traveled to the U.S. Vanetik gave to Bektayev the Trek incorporation documents. Vanetik declared that Bektayev was the only incorporator, president and the sole shareholder of Trek. Vanetik also declared that

Bektayev was now the sole owner of Trek and held the title to the respective stake in Turan, whose restricted shares were issued to Trek. See Appendix A.

47.     For confirming that transaction, Vanetik gave to Bektayev a blank certificate for 100,000 shares of Trek and offered to Bektayev to sign that certificate twice, as Trek's president and as its secretary. Bektayev did so, as he was instructed.

48.     As the investigation showed, Trek was organized, however, as an entity in the category of a 'small business corporation', in which *nonresidents* had no right to be shareholders.   In particular, this prohibition is cited in the IRS Instruction #2553, Paragraph 4.  Furthermore, the authorized capital of Trek was not 100,000 as on the certificate, but 75,000,000 shares.

49.     Therefore, even if the Certificate were valid (which it was not), it translated to less of 1% of the authorized capital of Trek.  Furthermore, a small business corporation was not required to use an agent for stock transfers, which facilitated fraud.

50.     As a result, Bektayev was a victim of concealment and fraud.  He was asked to sign a stock Certificate in the name of Trek, which Certificate was automatically void, as signed by a nonresident alien.  At the same time, some other unknown stock of Trek was issued.  Instead of the promised 100% stake in Trek, Bektayev was given just 0% of interest in Trek; his control in Turan through Trek was, as a result of fraud, void.

51.     Based upon false representations by Turan's principals on consideration being paid, on June 24, 2005, 100% interest of Turan in TEP was registered with the government bodies of Kazakhstan.

52.     In mid-August of 2005, KEC received a new letter of guarantee from Turan and the Certificate of shares, made to Bektayev, as well as Turan's restricted shares issued to Trek, with the shares' numbers cited above.

53.     On August 16, 2005, a supplemental agreement was made between Turan and TEP, with the effect that now both jointly guaranteed the payment of $450,000 to KEC, in conformity with Turan's initial letter of guarantee, dated June 1, 2005.

54.     All arrangements between Turan and TEP were made upon Turan's misrepresentations to KEC and to the public. Turan claimed in its Press Releases going back to October of 2005 that its stock was traded in the Over The Counter (OTC) market under the symbol "TURP". See Appendix B, C.

55.     In fact, only about two trades in Turan stock, between insiders, took place, at $12.50 per share. Those trades were, on information and belief, for only 100 shares each, ostensibly for defrauding the public on the alleged market value of Turan shares. There was, however, no open market for TURP securities. These misleading trading transactions were undertaken by Turan's principals only for purposes of stock manipulations and for facilitating fraud. No public disclosure has been filed, as required by SEC.

56.     In the fall of 2005, TEP made an agreement with AO Kazakhstankasphyshelf for seismic works on the territory under the Concession. Works and any funding by Turan were far behind schedule, jeopardizing the terms of the Concession, which could be eventually rescinded by the Government of Kazakhstan if such non-performance continued.

57.     To comply with the terms of the Concession's grant, Turan was obliged to drill at least 4 wells on the territory under the Concession (also known in contracts as Arys Concession) in order to validate that license. Turan has to date failed to drill a single well. Coy H. Squyres (hereinafter "Squires"), Turan's Vice President Exploration, has yet to give a public explanation as to why and that this lack of activity threatens the

viability of the license. While Squyres has made public presentations on behalf of Turan to assist in raising investors funds in the U.S., this raises the question of where funds raised were indeed spent, and why the Vice President Exploration has failed to report any progress to the shareholders.

### (d) Organizational Changes after Kassymov's Death

58.    On January 7, 2006, TEP's Director General Kassymov died. The circumstances of his death, certified as from a natural cause (heart failure) were, however, strange. He was only 57 years old and had generally good faith (having been an athlete, a hockey player, in his younger years). Although there is no competent evidence at this time that his death was not from natural causes, the party that would have benefitted from his early death were Turan's principals, clearing for them the way to fully control the Concession project.

59.    Subject to discovery, Plaintiffs do not allege that anyone of Defendants was involved in that death, except for noting that such an early death could hardly be explained by natural causes. Kassymov was taking some medications (unidentified at this time) that he received from Vanetik. Kassymov revealed to Bektayev that taking such a medication, according to Vanetik, allowed him to drop medical treatment in Kazakhstan for 18 months, which may have played part in that early death.

60.    In February of 2006, Bektayev traveled to Los Angeles, meeting Vanetik, Squyres, and other Turan's principals. The parties discussed the plans after Kassymov's death. Bektayev was made the new President of TEP. Upon Bektayev's insistence to accelerate works and funding for exploration and for drilling wells, new plans were made towards the next series of necessary works on the Concession territory.

61.    From December of 2005 to April of 2006, various payments were made through TEP, apparently from investors' funds, to Kazakhstankaspishelf, totaling about $2 million.    At that time, certain works were accomplished, including contracting with farmers, on whose plots the exploration was accomplished.    With a looming possibility that the Concession could be revoked for non-performance, several steps were made to obtain the extension of the of exploration term for another 2 years.    Accounts were finally set up, processing and interpretation of seismic tests was accomplished (but their results were not signed for nor certified).

62.    In March-April of 2006, Turan's CEO Robert Van Duren ("Van Duren"), accompanied by Turan's employee Striganov, traveled to Kazakhstan where they interviewed candidates for the position of a new Director General of TEP and arranged for setting of a new office in Shymkent (Southern Kazakhstan).

63.    On April 19, 2006, Turan's principals secretly restructured holding of Trek, in a fraudulent manner, liquidating Bektayev's control over Trek (held by an invalid Certificate) and apparently issuing undisclosed shares.    Turan's principals did so in secrecy, without advising Bektayev.    The ensuing unauthorized appointments of Trek's new officers included Vanetik as secretary and treasurer, Sergey Lipatov as president and director, Alexy Stojarov as another director.    Bektayev's name was removed from Trek's list of officers.    Then, Kushnerenko was appointed the president, director and treasurer, and Asylkhan Brubayev as secretary.    Vanetik who personally controlled Trek stock, presided over the fraud with invalid stock given to Bektayev, and supervised these four persons listed as Trek's officers.

64.    On April 24, 2006, Turan sent a letter to Demir Kazakstan Bank in Kazakhstan where TEP's account was held, declaring that Bektayev was no longer President of TEP.

65.    On May 12, 2006, Turan sent a letter to Bektaev, confirming that he was no longer President of TEP, for no cause and without any explanations.

66.    On May 25, 2006, KEC filed a complaint in a municipal court in Kazakhstan, claiming that Turan was in breach of contract. By July of 2006, the municipal court in Kazakhstan issued a decision denying that claim. On October 11, 2006, the appellate court left the lower court's decision without changes.

67.    On June 16, 2006, Turan filed a complaint, Docket No. 06cv3795, against KEC and Bektayev in the U.S. District Court for the Central District of California, essentially alleging breach of contract and a plethora of improprieties. That complaint was brought in bad faith, because Turan refused to cooperate in discovery and did not intend to bring the case to trial. That action was dismissed voluntarily on March 27, 2007, after Turan was compelled by the Court to produce all documents relating to the contract with TEP, which documents Turan refused to produce.

68.    On October 12, 2006, KEC filed a complaint in the Inter-regional Commercial Court in Almaty, Kazakhstan, seeking to declare invalid the agreement on the sale of the 49% stake in TEP in March of 2005. The grounds for relief included the fact that the agreement was not endorsed by the Kazakhstan authorities, as required by Kazakh law.

69.    In January of 2007, Turan and KEC negotiated, unsuccessfully, to novate the initial agreement and to ultimately agree, that Turan had to honor its obligation to wire transfer $450,000 to KEC.

70.    On January 31, 2007, the Inter-regional Commercial Court in Kazakhstan made a decision in favor of KEC, holding invalid the transfer of KEC's 49% stake in TEP.

71.     In mid-February of 2007, Vanetik and Bektayev undertook new negotiations with regard to KEC's interest, as a result of which Turan committed to honor the initial agreement of March 26, 2005, including the wire transfer payment yet to be made.

72.     On February 26, 2007, Turan sent a draft novation agreement to KEC. As a part of the new agreement, Bektayev was to become a member of Turan's Board. On that same day, however, Turan increased its authorized capital to 150 million shares (diluting it from the initially agreed 100 million shares), in violation of the March 26, 2005 agreement. That was done without KEC's endorsement or knowledge at the time.

73.     On March 7, 2007, the Court of Appeals in Kazakhstan affirmed the decision of the lower court on KEC's suit, invalidating the transfer of KEC's 49% stake in the Concession to TEP. In April of 2007, TEP was, accordingly, re-registered in Kazakhstan, the 49% stake in TEP being returned to KEC. Upon that re-registration, KEC also filed in a lower court in Kazakhstan a claim for the remaining 51% stake in TEP, on the basis that KEC had the priority right and provided consideration for that 51% stake.

74.     In about April of 2007, Vanetik brought in Karabaeyv to Turan's management. On information and belief, Karabaeyv, a person with connections in the criminal underworld in Kazakhstan, was brought in by Vanetik to eliminate Bektayev physically and to ruin KEC. On information and belief, Karabayev was to organize racketeering activities in Kazakhstan and in the U.S., with Kushnerenko and Koichumanov acting on his orders.

### (e) Attempted Murder

75.     On June 29, 2007, the Appellate Court in Almaty, Kazakhstan, made a decision in accordance with which KEC obtained 51% stake in TEP. On July 11, 2007, that court issued the written decision.

76.     Later on that same day, July 11, 2007 a murder attempt was made on Bektayev's life in Almaty, Kazakhstan. The attempted murder took place in front of the office of KEC, at Dostyk, 33. Meirmanov was at the office and was a witness.

77.     Namely, when Bektayev was coming to his office, an unknown suspect, dressed in a track suit (despite the heat on that day), wearing a baseball cap, ran towards Bektayev from behind. When Bektayev, on the sounds of the runner's steps, was turning to the left and backwards to see, the attacker held his head with one hand and stabbed him with a knife in the kidneys area. The attacker ran away, apparently knowing in advance a short way between neighboring houses, disappearing in an unknown direction.

78.     Bektayev was taken by an ambulance to the emergency room of a local hospital. Because Bektayev was, at the moment of the knife attack, turning backwards, the stab went off the straight line, the knife went in a sheer direction, making a wound about 2 inches deep, leaving a cut about 2 inches long. That cut missed the kidneys or other vital organs. Bektayev was treated in the emergency room and survived.

79.     On the questions of police investigators who arrived at the hospital, Bektayev declared that he suspected certain competitors residing in California, naming Vanetik, Kushnerenko, their associates Kairat Kazhahmetov, as well as Vitaly Zielberberg, TEP's Director General at that time. The police department in Almaty opened the criminal case, started its investigation, declared search of a suspect using a sketch of the attacker's appearance, made on Bektayev's oral description. However, that search of a suspect (believed not to be a local person) and investigation were not productive to date.

80.     As a result of the stab wound, the prolonged treatment at the hospital and after the hospital, Bektayev was under a stress, inactive for several months. During that period of time, Defendants, operating out of the U.S. engaged in damaging the reputation of KEC,

made efforts to destroy KEC's business. There is circumstantial evidence that Turan's principals corrupted local judges in Kazakhstan to invalidate prior court decisions, now obtaining rulings against KEC. The ownership of TEP ended up to be under the control of Defendants. There were two more related court cases initiated in Kazakhstan, concerning the subject matter of TEP's ownership (still on appeal).

<u>(f) Investigation and Proceedings After Attempted Murder</u>

81.    To investigate these matters, Bektay sought a meeting with an employee of Turan who was present in Kazakhstan at that time, a geologist by the name Nikolai Davydov ("Davydov"). In September of 2007, the meeting took place, but Davydov, unusually, came with a bodyguard, as if there were reasons for that. Davydov asked Bektay: "What compromise KEC proposed?", as if he was instructed by his superiors at Turan to clarify the situation after the attempted murder.

82.    As stated above, KEC was under attack by Turan in courts in Kazakhstan. On September 11, 2007, Turan filed a statement to the Supervisory Judiciary Board of the City Court. Without a hearing, the Board remanded, without apparent reasons and without notifying KEC, the matter on the transfer of the 49% interest for a new consideration by the lower court. (A month later the assistant of the Chairman of that Board was charged with bribery in another, unrelated case. After this Chairman of that Board resigned).

83.    On December 29, 2007, the lower court made a new decision in favor of Turan, that regained 49% stake in TEP. On February 12, 2008, the lower court made decision, again, in favor of Turan, reversing the allocation of 51% stake to KEC. The Court of Appeals affirmed. The government's prosecutor, who intervened in that case, supported

19

KEC's position, but he was overruled. By May of 2008, the Court of Appeals affirmed another decision, on the reallocation of 49% stake in TEP.

84.     In early June, 2008, Karabayev invited Bektayev to have talks in the U.S. and then consented to Bektay's accompanying Bektayev. The subject matter was an attempt to clarify the situation, but, as subsequent events show, planned by Karabayev, in a racketeering style, to dissuade Bektayev from defending KEC's interests in the Concession and to give up. At about that time, Turan, on information and belief, enrolled to the Board Jim Fuller, formerly a senior official of the New York Stock Exchange, or Turan used his name for promotion purposes of its securities without his authorization.

85.     Karabayev's correspondence to Bektayev by e-mail is indicative that Karabayev acted as if he was familiar with the topics of eliminating persons, using in his e-mails menacing expressions such as "to bury", to "nail the coffin", "living out last days", and the like. Even though those words in Karabayev's e-mails were not directed at Bektayev (but at Vanetik, Karabayev's predecessor as Turan's president), the underlying sense was that Karabayev and others at Turan were at ease with threatening people.

86.     On July 10, 2008, the meeting of Bektayev and Bektay, on the one hand, with Karabayev and Voloshin, Turan's Chief Operating Officer, on the other hand, took place in the office of Ibar and Ibar Ventures, which also served as an office of Turan. That office is: 940 South Coast Drive, Suite 100, Costa Mesa, CA, 92626.

87.     One of the prime topics of the conversation was the attack on Bektayev in Almaty on July 11, 2007. Karabayev and Voloshin declared that such matter was handled "unprofessionally". They said that if it were done "professionally", then Kalashnikov automatic rifles would have been used to guarantee the kill. Bektayev and Bektay understood this as a veiled threat that next time this would be done "professionally".

Karabayev further said that former president of Turan, Vanetik, was no longer in charge and that he would eliminate Vanetik's involvement in that company altogether.

88.    On the next day, July 11, 2008 (which was the anniversary of the knife attack on Bektayev), Karabayev came to the hotel where Bektayev and Bektay stayed (Westin hotel in Costa Mesa , CA), and the second meeting took place.

89.    When Bektayev and Bektay defended in the ensuing conversation KEC's interests, Karabayev ultimately showed anger.    Karabayev, apparently no longer controlling his temper, said to the visitors: "We are sick and tired to make war, cut (opponents) and to litigate".

90.    In the context of the conversation, observing Karabayev's posture, body language and his face expression, it became immediately clear to Bektayev and Bektay that Karabayev was involved in the murder attempt on Bektayev a year before, on July 11, 2007, and now made little effort to hide it, instead using a menacing tone.

91.    After that, Bektaeyv and Bektay resolved to quietly cut short that meeting and their trip to Los Angeles, urgently changing their return air tickets and leaving on the next day.    Both were under the impression that they could be followed and that they were possibly unsafe or in some danger.

## COUNT 1.    RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO)
### (against all Defendants)

92.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-91 above.

93.    Karabayev and Vanetik were the driving forces in the RICO conspiracy.  (It is noteworthy that Vanetik has been known to have an armored car, an extraordinary feature for Los Angeles area).  Plaintiffs were injured by the racketeering activities of the Defendants for eliminating competition, including their use of violence, threats to use

21

violence, wire and mail fraud, theft of property, and money laundering. The enterprise has continued for more than four years, and it is still carrying on its illegal activities to this day.

94.    Defendants, acting as an enterprise, fraudulently deprived Plaintiffs of their material interests. That was backed by Defendants' using violent crimes to achieve their objectives and veiled threats to use contract murders. In particular, the attempt on Bektayev's life on July 11, 2007, was a felony in violation of 18 U.S.C. §§ 1958, 1959.

95.    As a part of the enterprise, the Defendants have shared in the proceeds of the various schemes. Each of the Defendants has received income derived directly or indirectly from a pattern of racketeering activity and has used or invested part of such income, or proceeds of such income in the establishment or operation of an enterprise which is engaged in or which affected interstate and foreign commerce in violation of 18 U.S.C. § 1962(a).

96.    Facts uncovered to date show that each Defendant received income from the enterprise in excess of the statutory minimum of $5,000, as follows:

-    (a) Turan received income from the enterprise when it obtained 49% and then 51% interest in TEP and using that fraudulently claimed interest in the Concession with the ultimate possible value of oil reserves in excess of $2 billion. Turan's income, obtained through eliminating competitor KEC and through issuance of securities on false pretenses, is difficult to be evaluated at this time. In particular, Turan received income from improper marketing securities, ultimately at the expense of KEC and other Plaintiffs.

-      (b) Trek received income from the enterprise when it obtained the controlling stock in Turan, 24,381,862 shares, which also translated into the control of the Concession with the ultimate possible value as cited above.

-      (c) Ibar received income from the enterprise, when it, on information and belief, commingled its assets with Turan. Among other things, Ibar's office was used as Turan's office.

-      (d) Ibar Ventures received income from the enterprise, when it, on information and belief, commingled its assets with Turan. Ibar Ventures' office was used as Turan's office.

-      (e) Karabayev received income from the enterprise, since he joined Turan in April of 2007 and received interest in Turan; on information and belief, he has gained control over Turan's assets. On information and belief, Karabayev commingled Turan's assets with the assets of Ibar and Ibar Ventures, siphoning Turan's assets into Ibar and Ibar Ventures, which entities he fully controlled.

-      (f) Vanetik received income from the enterprise, when he initiated, as Turan's president and employee, the acquisition of TEP's stock, since January of 2005. Vanetik benefitted from the sale of void securities to Bektayev. Vanetik further received income from manipulating with Trek's securities at the expense of KEC, Bektayev and other Plaintiffs.

-      (g) Voloshin received income from the enterprise as COO and employee of Turan and, on information and belief, as the initiator and organizer of the suspect issues of securities. Volishin admitted a racketeering objective of the enterprise stating to Bektayev that, as long as Turan received investors' proceeds, it ultimately did not matter

if oil would be found in Southern Kazakhstan, and, on information and belief, he participated in those proceeds' distribution.

-      (h) Koichumanov received income from the enterprise as a Director General and employee of TEP, that was fraudulently made subsidiary of Turan.

-      (i) Kushnerenko received income from the enterprise as an employee of Turan and of Trek.

-      (j) Striganov received income from the enterprise as an employee of Turan.

97.    Each Defendant received money more than the statutory minimum of $5,000, knowing the same to have been stolen, unlawfully converted or taken, in violation of 18 U.S.C. §§2314, 2315.

98.    Defendants' actions with regard to Plaintiffs constitute mail fraud and wire fraud under 18 U.S.C. §§1341 and 1343.

99.    Furthermore, each Defendant transferred money of the value of more than $5,000 or received money of the value of more than $5,000, knowing the same to have been stolen, unlawfully converted or taken, in violation of 18 U.S.C. §§1956 and 1957.

100.   Defendants conspired to violate 18 U.S.C. §§1962(a) and (c), acting in violation of 18 U.S.C. §1962(d), by agreeing to conduct the affairs of the enterprise by converting, laundering the funds, and using the laundered proceeds for their benefit.

101.   Plaintiffs have suffered loss of property in the amount that could be calculated as 24,381,862 shares in Turan, when Defendants declared one share value to be $12.50, or $304,773,275.

102.   Plaintiffs are entitled to relief on this Count, including the statutory trebling of damages.

//

## COUNT 2.    VIOLATION OF SECURITIES LAW
### (against all Defendants)

103.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-102 above.

104.    Defendants violated S.E.C. Rule 144 together with 15 U.S.C. §78j, 78t, 78i, 77l, 77o, 78k and 78t-1 by engaging in the prohibited activities with respect to the publicly traded securities, including but not limited to:

a. Suggesting to certain Plaintiffs to sell or transfer in brokered or non-brokered transactions, common stock that was restricted without lawfully complying with the Rules and Regulations of the S.E.C. and particularly with S.E.C. Rule 144.

b. In particular, Defendants' failing in the removal of such restrictive stock trading legends when the company was not then, nor has ever been, current in its filing requirements, which has been deliberate in its violation or avoidance of the securities requirements under SEC Rules, in order to continue stock manipulations.

c. Defendants' making misrepresentations to certain Plaintiffs about holding Turan through Trek and selling void securities to Bektayev and KEC, manipulating the market price of Turan common stock trading as restricted securities, other manipulative schemes and devices.

d. Defendants' trading in securities while in possession of material non-public information, and acting as insiders.

e. Trading in securities in violation of the S.E.C. Filing Requirements and when there was no public information available.

    f.  These violations were occurring when several officers, directors or employees in Turan and/or Trek, in particular Vanetik, Squyres and Jim Fuller, had previous small and/or public company experience which leaves no excuse for such deliberate and continuous violation of securities regulations and requirements.

    g.  In a representative example, Defendants traded, as between insiders, certain stock named TURP, at $12.50 per share. However, on information and belief, there were only a couple of trade transactions involving nominal amounts of 100 shares. Then they took steps to have such untrue price be reflected on Zacks Analytical website, Yahoo Financial, and other sources of information for investors, as though it were a market price. See Appendix B.

105.    In another example, Vanetick, in an e-mail to Bektayev on April 14, 2005, referred Bektayev to the sources showing that price at $12.50 a share, which later would be interpreted to be applicable to the value of the stock of 24,381,862 shares in Turan that was supposedly given to Bektayev and KEC.

106.    Since the beginning of marketing Turan's stocks, on information and belief, its principals did not arrange for a single general meeting of stockholders, or, at a very minimum, never advised Bektayev or KEC of it. Vanetik, using the fact that the Board consisted only of himself and Van Duren, essentially ran Turan as his personal venture, unaccountable to anyone.

107.    Defendants further engaged in conduct that is prohibited by pursuant to §10(b) and 20(a) of the Securities Exchange Act [15 U.S.C. §78j(b) and 78t(a)] and Rule 10b-5

promulgated by the S.E.C. [17 C.F.R. §240.10b-5] and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §77z-1.

108.    Defendants' conduct further invokes causes of action under 15 U.S.C. §78i (Manipulation of security prices), 15 U.S.C. §78j (Manipulative and deceptive devices), 15 U.S.C. §78t (Liability of controlling persons and persons who aid and abet violations), 15 U.S.C. §77I, (Civil liabilities arising in connection with prospectuses and communications), 15 U.S.C §78k (Trading by members of exchanges, brokers and dealers), 15 U.S.C. §78j-1 (Audit requirements), 15 U.S.C §78m (Periodical and other reports), 15 U.S.C. §78p (Directors, officers, and principal stockholders), 15 U.S.C. §78r (Liability for misleading statements), 15 U.S.C. §78t-1 (Liability to contemporaneous traders for insider trading), and S.E.C. Rule 144.

109.    Due to the foregoing violations of the applicable law, S.E.C. rules and regulations, Defendants are liable for statutory damages, other damages, including consequential damages, suffered by Plaintiffs.

110.    Plaintiffs are entitled to relief on this Count.

### COUNT 3. CONVERSION
### (against all Defendants)

111.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-110 above.

112.    As stated above, Vanetik and other Defendants sold Trek's stock to Bektayev for his full ownership and for controlling the stock in Turan.

113.    Vanetik proposed that Bektayev himself signed a Certificate for 100,000 shares, twice, as a president and secretary of Trek and he gave to Bektayev Turan's corporate stamp. However, Vanetik and other Defendants knew that Bektayev, as an alien, had no

right to be a shareholder in a corporation created under IRS 1244 and that such a Certificate was nil and void.

114.   Defendants also concealed the fact that Trek's authorized capital was 75,000,000 shares and that these shares could be issued at any time by Trek's incorporator. Vanetik told Bektayev that Bektayev had the power to issue any number of shares in Trek himself, which was also untrue.

115.   As a result, Venetik and other Defendants converted Bektayev's and KEC's assets, represented by void stock, and his title to those assets, by using fraud.

116.   Among other things, having received value from KEC, Turan was obligated to transfer $450,000 to KEC. Turan failed to do so. As a result, Turan converted KEC's and other Plaintiffs' assets.

117.   Plaintiffs are entitled to relief on this Count.

### COUNT 4. BREACH OF CONTRACT
### (against Turan, Karabayev, Vanetik)

118.   Plaintiffs re-allege all of the allegations contained in paragraphs 1-117 above.

119.   On approximately 3 occasions, Defendants concluded Agreements with Plaintiffs, in the name of Turan, but each time breached those Agreements.

120.   As a result of Turan's and other Defendants' systematic breaching all attempted contracts, Defendants were injured.

121.   Plaintiffs are entitled to relief on this Count.

### COUNT 5. TORTIOUS INTERFERENCE
### WITH BENEFICIAL COMMERCIAL RELATIONSHIP
### (against Turan, Karabayev, Vanetik, Voloshin, Koichumanov)

122.   Plaintiffs re-allege all of the allegations contained in paragraphs 1-121 above.

28

123.   At all relevant times, the business opportunity was based on the Concession of the Government of Kazakhstan for the exploration and development of the oil and gas reserves in Southern Kazakhstan, that could translate in recoverable reserves with value of over $2 billion and eventually profits in excess of $1 billion.

124.   By way of hostile activities against Plaintiffs, Defendants jeopardized KEC's and other Plaintiffs' beneficial relationship with the various bodies of the Kazakhstan Government.  As one of the consequences, Kinozhus's filming a documentary on the oil exploration in Southern Kazakhstan, contemplated within the Kazakh official bodies for public relations purposes, was made impossible.

125.   Plaintiffs are entitled to relief on this Count.

### COUNT 6.  FRAUD AND MISREPRESENTATION
### (against Turan, Karabayev, Vanetik, Voloshin, Koichumanov, Striganov)

126.   Plaintiffs re-allege all of the allegations contained in paragraphs 1-126 above.

127.   At all relevant times, certain Defendants planned to defraud Plaintiffs, by means of making false misrepresentations, essentially in the entire course of contacts with Plaintiffs.

128.   In a representative example, Vanetik gave to Bektayev a Certificate (for 100,000 shares) in Trek, with the false proposition that this represented all of Trek's stock and that it guaranteed to hold 24,381,862 shares in Turan, whoever held Trek's stock.  Vanetik also misrepresented as if Bektayev could issue himself any number of shares in Trek, up to its authorized capital of 75,000,000 shares, and giving to Bektayev Trek's corporate stamp which was supposed to constitute title delivery, but which stamp controlled nothing and could be replaced.

29

129.    However, in the real life, Bektayev, as an alien, had no right to hold stock in Turan, by virtue of its registered status of a small business company, in which only residents could hold stock. As a result, instead of 100% control, Bektayev was defrauded to hold actually 0% control in Trek and in Turan.

130.    Defendants essentially elected the pattern and complicated schemes of defrauding Plaintiffs at all significant junctures, with the overall scale of such fraudulent activities translating in damages for $304,773,275, as shown elsewhere.

131.    In order to achieve their objectives, Defendants engaged in systematic misrepresentation of facts, as well as concealment of material facts. That included the misrepresentations about the value of stock in Turan, issue of securities, control by Trek of Turan, and systematically in other instances.

132.    Plaintiffs are entitled to relief on this count.

### COUNT 7.    UNJUST ENRICHMENT
### (against all Defendants)

133.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-132 above.

134.    Using fraud and misrepresentations, in combination with violations of the RICO statutes, as cited above, Defendants were unjustly enriched, at the expense of Plaintiffs.

135.    For example, the purported transfer of Trek's stock, ostensibly translating to $304,773,275 value, was fraudulently made void; the voided consideration unjustly enriched Defendants. See Appendix A, B.

136.    Defendants collected substantial assets from investors in the U.S., exploiting the Concession project, without the intention to materialize the exploration of oil, all this at the expense of Plaintiffs who were unlawfully removed from their fair share and role in

the Concession. While using investors' proceeds, Defendants inflated the prices of actual outlays in Kazakhstan, routing certain cash flow for their immediate enrichment.

137.    Plaintiffs are entitled to relief on this Count.

**COUNT 8.    CIVIL CONSPIRACY
(against all Defendants)**

138.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-137 above.

139.    At all relevant times, Defendants, and all of them, formed a civil conspiracy used against Plaintiffs for depriving Plaintiffs of lawful consideration.

140.    Plaintiffs are entitled to relief on this Count.

**COUNT 9.    FRAUDULENT CONVEYANCES; ACCOUNTING
(against Turan, Trek, Ibar, Ibar Ventures, Karabayev, Vanetik, Voloshin,
Koichumanov)**

141.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-140 above.

142.    Defendants engaged in an unauthorized issuance of stock, marketing securities and other conduct, without disclosure to Plaintiffs who were entitled to that information. Plaintiffs believe that Defendants used double accounting methods: one for showing to investors, the other for real accounting. Defendants engaged in fraudulent conveyances.

143.    In particular, on information and belief, Karabayev caused commingling of assets and caused Turan's assets be siphoned into Ibar and Ibar Ventures under his full control.

144.    Plaintiffs are entitled to relief on this Count, namely fraudulent conveyances should be undone, and accounting ordered.

**COUNT 10.    DECLARATORY RELIEF
(against Turan, Trek, Ibar, Karabayev, Vanetik, Koichumanov)**

145.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-144 above.

146.    Based on the above cited facts, the acquisition by Turan of control over TEP should be declared void and nil, as premised on fraudulent conduct of Defendants.

31

147.    More specifically, at no time did the parties reach a 'meeting of the minds', whereas Turan's principals acted at all times with the inherent intent to defraud and not to comply with any contractual terms, systematically acting in bad faith.

148.    Consequently, given the pervasive fraud committed by Turan and its principals in entering in agreements with KEC, Bektayev and other Plaintiffs, all such attempted agreements should be declared nil and void, and KEC should be declared the sole lawful title holder of the rights to the Concession. Vanetik, Karabayev, Voloshin, Koichumanov should be declared unfit for transactions with securities in the U.S. within the jurisdiction of SEC, and, upon the Court's conclusion, their conduct should be referred to SEC.

149.    Plaintiffs are entitled to relief on this Count.

### COUNT 11.    DAMAGE TO BUSINESS REPUTATION
### (against all Defendants, except Ibar and Ibar Ventures)

150.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-149 above.

151.    At all relevant times, Defendants engaged in a willful and preplanned conduct to destroy the reputation of Plaintiffs. That included spreading damaging information about Plaintiffs, effecting their ability to transact business with regard to the Concession, to undertake other business, pursue other business opportunities in Kazakhstan and elsewhere.

152.    Plaintiffs are entitled to relief on this Count.

### COUNT 12.    DAMAGES FOR BODILY INURY, ATTEMPTED MURDER
### (against Turan, Karabayev, Vanetik, Kushnerenko)

153.    Plaintiffs re-allege all of the allegations contained in paragraphs 1-152 above.

154.    On July 11, 2007, Bektayev, a victim of an attempted murder, was gravely wounded, which resulted in his hospitalization and a prolonged recovery.

32

155.    Bektayev's health has never fully recovered, nor can his health be fully restored after the stab wound in the area of the kidneys. (Expert testimony will show that if the knife stab were only an inch away from the actual wound or an inch deeper, it would have certainly been lethal.)

156.    The estimates for Bektayev's medical expenses cannot be estimated with precision. That included a bodily injury, with the irreversible negative past and future effect on his health and his life. Bektayev's psychological trauma and sufferings should be also fully evaluated.

157.    Additionally, Bektayev's loss of income when he was incapacitated while recovering should be compensated too, in the light of his supporting a family with minor children. These estimates and expert testimony should be fully evaluated and will be submitted to the jury's decision, including punitive damages for such despicable criminal conduct, as sought herein.

158.    Plaintiffs are entitled to relief on this Count.

//

WHEREFORE, Plaintiffs pray for the following relief:

- damages estimated at $304,773,275, with the statutory trebling damages as authorized pursuant to 18 U.S.C. §1964(c);

- inclusion into those damages or citation of separate damages for private action for Defendants' securities law violations;

- damages for the bodily injury and sufferings of Bektayev resulting from attempted murder, inclusive medical treatment costs for treating the wound, such damages to be ascertained upon expert testimony at trial;

- inclusion into the above damages or separate punitive and further other damages as the Court finds just;

- injunctive relief, seeking an Order made to Defendants to seize and desist from using Turan stock for purposes of marketing questioned securities, misrepresenting their control in any foreign concerns;

- declaratory relief, such as declaring the agreements between Turan and TEP void, and other appropriate declaratory relief;

- attorneys' fees and costs,

- such other and further relief as the Court may find just and proper.

Dated: August 4, 2008

APPENDIX: 13 pages

Respectfully submitted:

GEORGE LAMBERT, Esq.
District of Columbia bar #979327
Law Offices
1025 Connecticut Ave., Suite 1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897; Fax (202) 857 9799
Attorneys for Plaintiffs
E-mail: LawDC10@aol.com

34

## DEMAND OF JURY TRIAL

Plaintiffs demand jury trial.

Dated: August 4, 2008

Respectfully submitted:

GEORGE LAMBERT, Esq.
District of Columbia bar #979327
Law Offices
1025 Connecticut Ave., Suite 1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 857 9799
Attorneys for Plaintiffs
E-mail: LawDC10@aol.com

35

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 30, 2008

/s/
Yerlan Bektayev, Director
Kazakhenergocom TOO

## VERIFICATION OF COMPLAINT

I, Yerkin Bektaeyv, Director of Kazenercom TOO, state and depose under the penalty of perjury that I have read the foregoing Complaint and know the contents therefore. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 30, 2008

/s/ _____
Yerkin Bektayev, Director
Kazakhenergocom TOO

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Kazenerkom TOO, Association of Kazakh Investors and Entrepreneurs, Kinozhuz, et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

George Lambert, Esq., Law Offices,
1025 Connecticut Ave., #1000, NW
Washington, D.C., 20036;
Tel. (202) 640 1897

## DEFENDANTS

Turan Petroleum, Inc.; Trek Rescoures, Inc.; Ibar Development LLC; Ibar Ventures LLC; Askar Karabayev; Anatoly Vanetik; Naum Voloshin, Alexander Kushnerenko, Alex Strigapov

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

Case: 1:08-cv-01339
Assigned To : Huvelle, Ellen S.
Assign. Date : 8/4/2008
Description: General Civil

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ⊙ Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⊙ 5 |
| Citizen or Subject of a Foreign Country | ⊙ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust

- ☐ 410 Antitrust

### ⊠ B. Personal Injury/ Malpractice

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☒ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ⊠ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☒ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530** Habeas Corpus-General<br>☐ **510** Motion/Vacate Sentence | ☐ **442** Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895** Freedom of Information Act<br>☐ **890** Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152** Recovery of Defaulted Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710** Fair Labor Standards Act<br>☐ **720** Labor/Mgmt. Relations<br>☐ **730** Labor/Mgmt. Reporting & Disclosure Act<br>☐ **740** Labor Railway Act<br>☐ **790** Other Labor Litigation<br>☐ **791** Empl. Ret. Inc. Security Act | ☐ **441** Voting (if not Voting Rights Act)<br>☐ **443** Housing/Accommodations<br>☐ **444** Welfare<br>☐ **440** Other Civil Rights<br>☐ **445** American w/Disabilities-Employment<br>☐ **446** Americans w/Disabilities-Other | ☐ **110** Insurance<br>☐ **120** Marine<br>☐ **130** Miller Act<br>☐ **140** Negotiable Instrument<br>☐ **150** Recovery of Overpayment & Enforcement of Judgment<br>☐ **153** Recovery of Overpayment of Veteran's Benefits<br>☐ **160** Stockholder's Suits<br>☒ **190** Other Contracts<br>☐ **195** Contract Product Liability<br>☐ **196** Franchise | ☐ **441** Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

18 U.S.C. Section 1964(c)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** $305.0 million | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☒    NO ☐ |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☐    If yes, please complete related case form.

DATE  August 4, 2008    SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# **Annex  A**





**COMMON STOCK**

*TURAN PETROLEUM, INC.*

SHARES AUTHORIZED 50,000,000
PAR VALUE $0.001

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

**COMMON STOCK**

**CUSIP 89989J 10 6**

SEE REVERSE FOR CERTAIN DEFINITIONS

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF
**TURAN PETROLEUM, INC.**

transferable on the books of the Corporation by the holder hereof, in person or by duly authorized attorney, upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness this facsimile seal of said Corporation and the facsimile signatures of its duly authorized officers.

Dated:  **August 22, 2005**

SECRETARY

PRESIDENT

CORPORATE
NEVADA
SEAL

COUNTERSIGNED AND REGISTERED
**EMPIRE STOCK TRANSFER INC.**
Transfer Agent and Registrar

By
AUTHORIZED SIGNATURE



COMMON STOCK

COMMON STOCK

CUSIP 89989J 10 6

SEE REVERSE FOR CERTAIN DEFINITIONS

TURAN PETROLEUM, INC.

PAR VALUE $0.001

INCORPORATED UNDER THE LAWS OF THE STATE OF
NEVADA

***TREK RESOURCES INC.***

***NINE MILLION EIGHT HUNDRED THOUSAND***

FULLY PAID AND NON-ASSESSABLE SHARES OF COMMON STOCK OF

TURAN PETROLEUM, INC.

Dated:   July 12, 2005

COUNTERSIGNED AND REGISTERED
EMPIRE STOCK TRANSFER INC

2376

# Annex  B

| HOME | ZACKS RESEARCH | PORTFOLIO | COMMUNITY | BROKER RESEARCH | MARKETS | SCREENING | EDUCATION | SERVICES |

Earnings    EPS Surprises    Mutual Funds    Options    My Account    Help

# ZACKS
**INVESTMENT RESEARCH**
*Proven Ratings, Research & Recommendations*

**Zacks Education**
Visit Zacks' **Education** section for investing guides and other free resources to make you a better investor.

Quote    [GO]    Search for Ticker    Login    Search: [        ] [GO]

**Get 100 Free Trades. E*TRADE Securities**    **4 Trading Technologies Try them for FREE!**

## Top Zacks Features
Free Membership
Zacks Rank
Equity Research
My Portfolio
Stock Screener
Profit Tracks
Mutual Funds
Options
Zacks Video
Zacks Trading Game
RSS Feed [RSS]
Profit from the Pros

## Subscription Services
Product Guide
Method for Trading
Breakout Trader
Champion Trader
Chart Patterns Trader
Momentum Trader
Options Trader
Surprise Trader
Value Trader
Invest with Zacks
Partner Newsletters
Special Reports
Top 10 Stocks
Research Wizard
Zacks Premium
Zacks Elite

**Stock Quote: TURAN PETROLEUM (TURP)**    Enter Ticker: [    ] [GO >]

Quote    Charts    Company Reports    Financials

Quote | Detailed Quotes | Real Time | Options Chain | Greeks Montage

[Quote]

**100 FREE TRADES** E*TRADE Securities LLC

## TURAN PETROLEUM (OTC)
TURP    12.50    N/A    (N/A%)    Vol. 0    N/A ET

| | |
|---|---|
| Day Low - High | N/A - N/A |
| 52wk Low - High | 12.50 - 12.50 |
| Avg Volume | N/A |
| Industry | N/A |
| Market Cap | N/A |
| Div - Yield | N/A - N/A |
| PE (forward) | N/A |
| PEG Ratio | N/A |
| Current Year Est. | N/A |
| EPS Last Year | N/A |
| Detailed Quote | |

> Notation by plaintiffs: Quotation published in various Internet sources

**Charts for Turan Petroleum Inc (TURP)**    Jul 31 6:48 PM EDT

**Intraday**    ○ Area    ○ Line    ○ Bar    ○ Candlestick

```
                                    20.00
                                    15.00
                                    10.00
                                     5.00
                                     0.00
10am         12pm        2pm
■ Volume
```

July 31, 2008    © quotemedia.com

**Intraday** | **5 Dy** | **1 Mo** | **3 Mo** | **6 Mo** | **1 Yr** | **2 Yr** | **5 Yr** | **10 Yr**

NYSE data is at least 20 minutes delayed
NASDAQ data is at least 15 minutes delayed
**Interactive Java Charting**
**Comparative Chart**
**New: Zacks Trading Game**

### Zacks Premium Research
| | |
|---|---|
| Zacks Rank (?) | |
| Zacks Recommendation (?) | |
| Zacks Target Price (?) | |
| Zacks Industry Rank (?) | |
| Rank in Industry (?) | |
| Zacks Equity Research Report (?) | |

### BROKERAGE RECOMMENDATIONS
| | |
|---|---|
| Current ABR | N/A |
| ABR (Last Week) | N/A |
| # of Recs in ABR | N/A |
| Average Target Price | N/A |
| Industry Rank by ABR | N/A out of 217 |
| Rank in Industry | N/A out of N/A |
| More Brokerage Recommendations | |



# Stock
## of the
# Day



75¢
PER
OPTIONS CONTRACT



**NEWS FOR TURP**

More News

**ZACKS COMMENTARY FOR TURP**

More Commentaries

**EARNINGS ESTIMATES**

| | This Quarter N/A | Next Quarter N/A | This Year N/A | Next Year N/A |
|---|---|---|---|---|
| Average Estimate | N/A | N/A | N/A | N/A |
| Number of Estimates | N/A | N/A | N/A | N/A |
| Low Estimates | N/A | N/A | N/A | N/A |
| High Estimate | N/A | N/A | N/A | N/A |
| Year Ago EPS | N/A | N/A | N/A | N/A |
| EPS Growth | N/A% | N/A% | N/A% | N/A% |

More Estimates

Average Earnings Estimates for TURP

EPS Growth for TURP [percent]

**COMPANY DESCRIPTION**

N/A

Full Company Report

**FINANCIALS**

| | |
|---|---|
| EPS TTM | N/A |
| Sales | N/A |
| Net Income | N/A |
| Price/Earnings | N/A |
| Price/Book | N/A |
| Price/Cash Flow | N/A |
| Price/Sales | N/A |

More Financials

About Zacks | Invest with Zacks | Advertise | Media | Careers | Contact Us | **Help**
Disclaimer | Privacy Policy | Sitemap
NYSE and AMEX data is at least 20 minutes delayed. NASDAQ data is at least 15 minutes delayed.
Copyright 2008 Zacks Investment Research

TURP.PK: Summary for TURAN PETROLEUM - Yahoo! Finance

Dow ↓ 0.45%   Nasdaq ↓ 0.63%

Finance Search

Sat, Aug 2, 2008, 1:12PM ET - U.S. Markets Closed.

# TURAN PETROLEUM (TURP.PK)

More On TURP.PK

- **Quotes**
  - ◆ Summary
  - · Historical Prices
- **Charts**
  - · Interactive
  - · Basic Chart
  - · Basic Tech. Analysis
- **News & Info**
  - · Financial Blogs
  - · Message Board
- **Company**

- **Analyst Coverage**

## TURAN PETROLEUM (Other OTC: TURP.PK)

| | | | | |
|---|---|---|---|---|
| Last Trade: | 12.50 | | Day's Range: | N/A - N/A |
| Trade Time: | Dec 31 | Quotes delayed, | 52wk Range: | N/A |
| Change: | 0.00 (0.00%) | except where | Volume: | 0 |
| Prev Close: | 12.50 | indicated otherwise. | Avg Vol (3m): | N/A |
| Open: | N/A | For | Market Cap: | N/A |
| Bid: | N/A | consolidated | P/E (ttm): | N/A |
| Ask: | N/A | real-time | EPS (ttm): | N/A |
| 1y Target Est: | N/A | quotes | Div & Yield: | N/A (N/A) |

**(incl. pre/post market data), sign up for a free trial of Real-time Quotes.**

On Dec 31: **12.50** 0.00 (0.00%)

Notation by plaintiffs: Quotation published in various Internet sources

Chart Not Available

customize chart

- ✦ Add TURP.PK to Your Portfolio
- 🔔 Set Alert for TURP.PK
- 📥 Download Data
- ✦ Add Quotes to Your Web Site

TURP.PK: Summary for TURAN PETROLEUM - Yahoo! Finance

Case 1:08-cv-01339-ESH    Document 1-3    Filed 08/04/2008    Page 9 of 12

| | |
|---|---|
| Quarterly EPS Est () : | N/A |
| Mean Recommendation*: | N/A |
| PEG Ratio (5 yr expected): | N/A |

* (Strong Buy) 1.0 - 5.0 (Sell)

**Analyst Opinion | Estimates**

**BUSINESS SUMMARY**

No business summary available for TURP.PK.

Quotes delayed for TURP.PK. Get streaming real-time quotes - FREE trial

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, NYSE and Amex. See also delay times for other exchanges.

Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Real-Time ECN quotes provided by BATS Trading.Financials data provided by Edgar Online. Dividend data provided by Hemscott Americas.Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fund summary, fund performance and Morningstar Index data provided by Morningstar. Analyst estimates data provided by Thomson Financial Network. All data povided by Thomson Financial Network is based solely upon research information provided by third party analysts. Yahoo! has not reviewed, and in no way endorses the validity of such data. Yahoo! and ThomsonFN shall not be liable for any actions taken in reliance thereon. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

# Annex  C

# PressReleaseSpider.com

Search

| Search |

**Turan Petroleum, Inc. (OTC: TURP), an independent oil and gas exploration company, today announced that it has retained the law firm of Greenberg Traurig, LLP to provide legal services and advice related to Turan Petroleum's operations. Turan Petroleum has also engaged a Canadian geological consulting firm, LIB Consultants, Ltd, and a Kazakhstan based geological consulting firm, TOO KazMunai GeoServices, (engaged directly by TOO Turan EnerPetroleum, Turan Petroleum's wholly owned Kazakstan based subsidiary) to assist with ongoing analysis of existing geological studies, assure government compliance and provide for timely satisfaction of reporting requirements. TOO KazMunai GeoServices plans to conduct further geological studies, in an effort to develop Turan Petroleum's ARYS concession, held through its Kazakhstan based subsidiary, TOO Turan EnerPetroleum.**

**Released:**    10/16/2005 1:25:05 AM
**Company URL:**    http://www.prweb.com/releases/2005/10/prweb295695.htm

**Press Release:**

Turan Petroleum, Inc. (OTC: TURP), an independent oil and gas exploration company, today announced that it has retained the law firm of Greenberg Traurig, LLP to provide legal services and advice related to Turan Petroleum's operations. Turan Petroleum has also engaged a Canadian geological consulting firm, LIB Consultants, Ltd, and a Kazakhstan based geological consulting firm, TOO KazMunai GeoServices, (engaged directly by TOO Turan EnerPetroleum, Turan Petroleum's wholly owned Kazakstan based subsidiary) to assist with ongoing analysis of existing geological studies, assure government compliance and provide for timely satisfaction of reporting requirements. TOO KazMunai GeoServices plans to conduct further geological studies, in an effort to develop Turan Petroleum's ARYS concession, held through its Kazakhstan based subsidiary, TOO Turan EnerPetroleum.

The 8th largest law firm in the United States with over 1,400 attorneys worldwide, Greenberg Traurig, LLP, represents clients from all segments of oil and gas industries. Its clients range from independent producers and pipeline companies to major integrated companies, as well as foreign and domestic regulators and governments. LIB Consultants, Ltd. is a geological consulting firm headed by Dr. J.K. Lentin, an experienced geologist with substantial track record of success in

Kazakhstan. Dr. Lentin has published in excess of 50 peer-reviewed scientific papers, books and monographs.

LIB Consultants, Ltd. works in the development of new oil companies in Russia, and Kazakhstan, and has evaluated numerous oil and gas companies for public offerings. LIB is engaged on international projects in the oil and gas industry, leading teams of geologists, geophysicists and engineers in evaluations. LIB has also provided courses to oil company specialists in the US, Canada, China, and has designed specialized training for staff and management within oil companies in the former Soviet Union.

Dr. Lentin obtained CIDA grants for training of Russian oil industry professionals in Canada and for development of management training for LUKOIL employees. LIB has also worked in the preparation of submissions for World Bank, IMF, EBRD, EximBank, and government of Canada project funding.

KazMunai GeoServices was engaged to provide analysis of geological studies performed from the beginning in 2001 through 2005. KazMunai Geo Services intends to work closely with Turan EnerPetroleum to provide and satisfy government reporting requirements, and work with in house geologists and Western consultants to advance the development of the ARYS concession. "KazMunai GeoServices possesses the requisite expertise to organize and evaluate our geological studies," observes Yedil Kassymov, President of Turan EnerPetroleum. "We are effectively arranging a robust support system for our project," further points out Kassymov. Turan Petroleum's President, Tony Vanetik, states that, "we are rapidly building a strong, experienced team to drive the ARYS development."

A wholly owned subsidiary of Turn Petroleum, Inc., TOO Turan EnerPetroleum is the licensee of the Government of Kazakhstan's ARYS Concession (Contract # 753) for exploration of hydrocarbons. Turan's ARYS site covers approximately 22,000 square kilometers in the Southern Kazakhstan's Kizilordinskoy Region. Initial geological studies have been completed that show the potential of locating substantial amounts of recoverable oil and gas products inside the company's Concession. The studies and initial exploratory drilling have proven the existence of substantial salt structures within the Concession.

A limited number of seismic lines have already identified numerous bright spots in association with the salt structures. The Company and its consultants believe these bright spots may be indicators of hydrocarbons. Turan Petroleum, Inc. intends to undertake further geological studies, conduct exploratory drilling and extract hydrocarbons from the ARYS site. The South-Kazakhstan Region, which is home to the company's ARYS Concession, contains about 2 million people, and is situated along the famous Silk Road from Tashkent to Baku.

Turan Petroleum, Inc. is an oil and gas exploration company based in California. Through its wholly owned Kazakhstan subsidiary, TOO Turan EnerPetroleum, the Company is pursuing opportunities in new energy markets, focusing on acquisition and development of oil and gas properties in Eurasia, and other resource rich regions of the former Soviet Union.

Forward-looking statements in this announcement are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Although